[Cite as *State v. O'Neil*, 2024-Ohio-512.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

STATE OF OHIO,

      Plaintiff-Appellee,

- vs -

PATRICK S. O'NEIL,

      Defendant-Appellant.

CASE NO. 2023-L-050

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2022 CR 001348

**O P I N I O N**

Decided: February 12, 2024
Judgment: Affirmed

*Charles E. Coulson*, Lake County Prosecutor, and *Kristi L. Winner*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Vanessa R. Clapp*, Lake County Public Defender, and *Melissa A. Blake*, Assistant Public Defender, 125 East Erie Street, Painesville, OH 44077 (For Defendant-Appellant).

MARY JANE TRAPP, J.

{¶1}    Appellant, Patrick S. O'Neil ("Mr. O'Neil"), appeals from the judgment of the Lake County Court of Common Pleas sentencing him to an aggregate prison term of 11 to 16.5 years for aggravated burglary and kidnapping following a jury trial.

{¶2}    Mr. O'Neil raises five assignments of error, contending (1) the trial court erred in how it investigated potential juror misconduct; (2) the trial court committed plain error by failing to declare a mistrial; (3) he received ineffective assistance of trial counsel;

(4) the trial court erred by denying his Crim.R. 29(A) motion for acquittal; and (5) his convictions are against the manifest weight of the evidence.

{¶3} After a careful review of the record and pertinent law, we find as follows:

{¶4} (1) Mr. O'Neil has not established plain error regarding how the trial court investigated potential juror misconduct involving two jurors who engaged in conversation during a break in testimony. Based on the record before us, we cannot say that a separation order regarding the person who overheard the conversation and the two jurors would have changed the outcome of the trial court's investigation or that the lack of a separation order created a manifest miscarriage of justice. We also find no plain error regarding the substance of the trial court's questioning of the two jurors.

{¶5} (2) Mr. O'Neil has not established plain error regarding the trial court's failure to declare a mistrial. Without a predicate finding of juror misconduct, there was no basis for the trial court to declare a mistrial.

{¶6} (3) The trial court did not err by denying Mr. O'Neil's Crim.R. 29(A) motion for acquittal. The state presented sufficient evidence, if believed, to establish the elements of aggravated burglary and kidnapping beyond a reasonable doubt.

{¶7} (4) Mr. O'Neil's convictions are not against the manifest weight of the evidence. Upon review of the record, the jury did not clearly lose its way and create a manifest miscarriage of justice in its assessment of the witnesses' credibility.

{¶8} (5) Mr. O'Neil has not established ineffective assistance of trial counsel regarding defense counsel's opening the door to harmful testimony, handling of potential juror misconduct, or failure to address his and another defense witness' prior convictions.

2

Case No. 2023-L-050

**{¶9}** Thus, Mr. O'Neil's assignments of error are without merit, and we affirm the judgment of the Lake County Court of Common Pleas.

## Substantive and Procedural History

**{¶10}** This appeal involves Mr. O'Neil's convictions for trespassing into the home of Paul Denslow ("Mr. Denslow") and assaulting him. At the time, Mr. Denslow was 56 years old and on disability. He had been diagnosed with liver cancer, which caused him to lose a substantial amount of weight. Mr. Denslow lived in an apartment in Mentor, Ohio, located across the street from a bar known as the Shamrock Inn.

### *The Alleged Drugging*

**{¶11}** Three days prior, on November 17, 2022, Mr. Denslow and his friend, Mark Payerchin ("Mr. Payerchin"), went to the Shamrock for a drink. The bartender, Jennifer Hefner ("Ms. Hefner"), was upset because she found out her daughter was not coming home for Christmas. She was holding a bottle of Jack Daniels in one hand and a shot glass in the other and was observed drinking five or six shots.

**{¶12}** Mr. Payerchin left the bar and bought Ms. Hefner a bouquet of flowers. After returning to the Shamrock and giving her the flowers, Mr. Payerchin left the bar again and bought Ms. Hefner a bouquet of purple flowers because she said that was her favorite color. When he returned to the Shamrock the second time, Ms. Hefner was inebriated to the point of falling down, throwing up, and urinating herself. Mr. Payerchin kneeled down to assist Ms. Hefner and rubbed her back, at which point an unknown man told him to keep his hands off her. Brittany Rizzo ("Ms. Rizzo"), another Shamrock employee, arrived shortly thereafter, at which time Mr. Denslow and Mr. Payerchin left the bar for the night.

Case No. 2023-L-050

{¶13}  Meanwhile, Mr. O'Neil arrived at the Shamrock after an out-of-town trip.  He was a regular at the Shamrock and had known Ms. Hefner for many years.  Upon arrival, Mr. O'Neil observed two dozen roses lying on the bar, Ms. Hefner lying unconscious on the floor, and Mr. Payerchin grabbing her buttocks and rubbing her back.  He told Mr. Payerchin to remove his hands from Ms. Hefner and assisted in getting her home.  While several people later described Ms. Hefner's behavior that evening as highly unusual, she did not go to the hospital, and no one called the police.  Upon thinking over the events of the evening and searching the internet, Mr. O'Neil became convinced that Mr. Payerchin had drugged Ms. Hefner.  He then told Ms. Hefner about his theory and research.

### The Home Invasion

{¶14}  On November 20, 2022, Mr. Denslow invited Ms. Hefner to his apartment for dinner.  She called Mr. Denslow at about 10 p.m. that evening, but he did not answer because he was not feeling well.  A brief time later, Ms. Hefner showed up at his door.  She told Mr. Denslow that she had brought over marijuana for them to smoke; however, her true motive was to question him about whether Mr. Payerchin drugged her.  In fact, Mr. O'Neil had accompanied Ms. Hefner to the apartment, although he initially stayed outside.  At Ms. Hefner's urging, Mr. Denslow called Mr. Payerchin, while Mr. O'Neil listened outside through the door.

{¶15}  According to Mr. Denslow, he was sitting on the couch when Mr. O'Neil opened the door and entered his apartment.  Mr. O'Neil flipped the couch backward onto the floor, put his knees on Mr. Denslow's chest and arm, and began asking Mr. Denslow questions about Mr. Payerchin.  With one hand, Mr. O'Neil grabbed Mr. Denslow by the

4

throat and choked him to the point where his eyes went white and his ears rang. With his other hand, Mr. O'Neil punched Mr. Denslow in the face.

{¶16} Eventually, Mr. Denslow was moved to the kitchen. Mr. O'Neil picked up a kitchen knife, dragged it across Mr. Denslow's forearm, and said, "You're going to die tonight." Ms. Hefner began searching Mr. Denslow's cupboards and closets and came across a bottle of prescription heartburn pills belonging to Mr. Payerchin. She crushed the pills, mixed them with nasal spray, and forced Mr. Denslow to ingest them while Mr. O'Neil held his head back.

{¶17} At one point, Ms. Hefner left the apartment and went to the Shamrock to see if Mr. Payerchin was there. While waiting for her to return, Mr. Denslow smoked a cigarette and drank a beer with Mr. O'Neil's permission. Mr. O'Neil made himself a tuna sandwich and smoked one of Mr. Denslow's cigarettes. At Mr. O'Neil's direction, Mr. Denslow called Ms. Hefner from his phone because she was taking so long to return.

{¶18} Ms. Hefner eventually returned to the apartment. Mr. O'Neil told Mr. Denslow that he better not warn Mr. Payerchin or call the police. After the nearly two-hour ordeal, Mr. O'Neil and Ms. Hefner left the apartment. Ms. Hefner took the pill bottle with her. Mr. Denslow deadbolted the door and put a chair underneath the doorknob. He discovered that Mr. O'Neil had taken a pellet gun, a hunting knife, and a Halloween mask.

{¶19} Mr. O'Neil's version of events was different. He denied trespassing into Mr. Denslow's home or assaulting him. Rather, he knocked on the door, at which time Mr. Denslow invited him inside. While entering the apartment, he accidentally flipped the couch over backward but quickly set it back in place. He admitted telling Mr. Denslow that he was going to die in prison for his involvement in Ms. Hefner's alleged drugging but

5

claimed he was never physically violent. He also admitted taking Mr. Denslow's pellet gun, hunting knife, and Halloween mask but claimed he was given permission.

{¶20} According to Anastasia Colonna-Danielson ("Ms. Colonna-Danielson"), another bartender at the Shamrock, Mr. O'Neil came into the bar the day after the incident and confided in her. Mr. O'Neil said he had gone to Mr. Denslow's apartment and used force to obtain information about Mr. Payerchin. In particular, Mr. O'Neil stated that he roughed Mr. Denslow up, ransacked his house, force-fed him, choked him until he passed out, and sliced him with a knife.

{¶21} Mr. Payerchin became concerned after Mr. Denslow did not return his phone calls. Two days after the incident, Mr. Payerchin went to Mr. Denslow's apartment and observed that he was scared, had a bruise on his face and a cut on his arm, and was holding his ribs. Mr. Denslow told him about the home invasion. Mr. Payerchin took Mr. Denslow to his house to spend the night. The next day, he took Mr. Denslow to the police station and the hospital.

### The Investigation

{¶22} On November 23, 2022, Mr. Denslow and Mr. Payerchin went to the Mentor Police Department, where Mr. Denslow reported the home invasion. The officer observed bruising around Mr. Denslow's left eye and a cut on his right forearm. The police took photos of Mr. Denslow's injuries; administered a photo lineup from which he identified Mr. O'Neil; sent technicians to process his apartment; and obtained surveillance video from his apartment complex. The police went to the Shamrock where they located Mr. O'Neil and arrested him. They also picked up Ms. Hefner for questioning and recovered Mr.

6

Payerchin's pill bottle from her residence. The police investigated Ms. Hefner's alleged drugging but ultimately did not find sufficient evidence to pursue the matter.

{¶23} Dr. Julie Pokersnik ("Mr. Pokersnik") treated Mr. Denslow at the emergency room of Lake West in Willoughby. He reported pain in his ribs, an injury to the right side of his face, and an injury to his right eye. He was diagnosed with a fractured cheekbone, a rib contusion, contusions to the eyelid and cheekbone, and a broken blood vessel in his eye.

{¶24} A few days later, Mr. Denslow found the kitchen knife Mr. O'Neil had used to cut him in his toolbox and reported it to the police. The Lake County Crime Lab analyzed the knife; however, the analysts did not discover usable fingerprints or blood and were not able to determine whether the knife handle contained Mr. O'Neil's DNA.

### Trial Court Proceedings

{¶25} The Lake County Grand Jury indicted Mr. O'Neil on nine counts: burglary, a second-degree felony, in violation of R.C. 2911.12(A)(1) (count 1); aggravated burglary, a first-degree felony, in violation of R.C. 2911.11(A)(1) (count 2); aggravated burglary, a first-degree felony, in violation of R.C. 2911.11(A)(2) (count 3); kidnapping, a first-degree felony, in violation of R.C. 2905.01(A)(3) (count 4); kidnapping, a first-degree felony, in violation of R.C. 2905.01(B)(2) (count 5); felonious assault, a second-degree felony, in violation of R.C. 2903.11(A)(2) (count 6); felonious assault, a second-degree felony, in violation of R.C. 2903.11(A)(1) (count 7); theft of drugs, a fourth-degree felony, in violation of R.C. 2913.02(A)(1) (count 8); and petty theft, a first-degree misdemeanor, in violation of R.C. 2913.02(A)(1) (count 9). Mr. O'Neil pleaded not guilty to the charges.

7

{¶26} The matter was tried to a jury over four days. The state presented testimony from Mr. Denslow; Mr. Payerchin; the owner of the Shamrock; the investigating law enforcement officers; Dr. Pokersnik; the property manager of Mr. Denslow's apartment complex; Ms. Colonna-Danielson; and two analysts from the Lake County Crime Lab. The state's exhibits included photos of Mr. Denslow's injuries and his apartment building and unit; surveillance video of Mr. Denslow's apartment complex; Mr. Denslow's medical records; photos from Ms. Hefner's house; call logs; and videos of Mr. O'Neil's arrest and police interview. Following the state's case-in-chief, the defense moved for acquittal pursuant to Crim.R. 29(A), which the trial court overruled.

{¶27} The defense presented testimony from Mr. O'Neil, Ms. Hefner, Ms. Rizzo, and three regular customers of the Shamrock.

{¶28} During a break in the defense's case, an intern at the Lake County Prosecutor's Office informed the trial court that she overheard two jurors in the restroom "talking about what occurred when the defendant was testifying." Specifically, she heard them say their "heads hurt," they were "annoyed," "he wouldn't stop talking," they were "aggravated," they "want to go home," and they were "sick of it." The trial court had the jury briefly enter the courtroom. After the jury was excused, the intern identified the two jurors she had overheard. The court separately questioned the two jurors in the courtroom, who both stated they had talked about being tired but denied discussing anything specific about the case. After the second juror was excused, the court asked the intern whether the juror's statements were accurate. The intern confirmed the jurors spoke about "feeling tired," but they also stated, "It was a longer one," and that they were "a little agitated and annoyed." Upon questioning from the state, the intern conceded she

8

had only observed a small portion of the trial and was not certain what the jurors were referring to. The intern said she "might have assumed [the jurors] were talking about the defendant," although "[t]hey never said it was related to him specifically." Defense counsel stated, "I recall you saying that [the jurors] said he was talking too much," but the intern denied making that statement. After discussing the matter with counsel, the trial court determined it was not necessary to declare a mistrial, and the trial continued.

{¶29} Following the presentation of evidence, the defense renewed its Crim.R. 29(A) motion for acquittal, which the trial court overruled. Following deliberations, the jury returned guilty verdicts on counts 1 (burglary), 2 (aggravated burglary), 5 (kidnapping), and 7 (felonious assault) and not guilty verdicts on counts 3 (aggravated burglary), 4 (kidnapping), 8 (theft of drugs), and 9 (petty theft). The jury was unable to reach a verdict on count 6 (felonious assault). The trial court ordered a presentence investigation and a victim impact statement and set the matter for sentencing.

{¶30} At sentencing, the trial court merged counts 1 (burglary) and 7 (felonious assault) into count 2 (aggravated burglary) and sentenced Mr. O'Neil to concurrent prison terms of 11 to 16.5 years on count 2 (aggravated burglary) and eight years on count 5 (kidnapping), for an aggregate prison term of 11 to 16.5 years. The trial court filed a judgment entry memorializing the jury's verdicts and Mr. O'Neil's sentences.

{¶31} Mr. O'Neil appealed and raises the following five assignments of error:

{¶32} "[1.] The defendant-appellant's constitutional rights to due process and fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution were prejudiced by the manner in which the trial court investigated potential juror misconduct.

9

Case No. 2023-L-050

{¶33} "[2.] The defendant-appellant's constitutional rights to due process and fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution were violated by juror misconduct and the trial court's failure to declare a mistrial was an abuse of discretion.

{¶34} "[3.] The defendant-appellant's constitutional rights to due process and fair trial under the Fifth, Sixth[,] and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution were prejudiced by the ineffective assistance of trial counsel.

{¶35} "[4.] The trial court erred to the prejudice of the defendant-appellant when it denied his motion for acquittal under Crim. R. 29(A).

{¶36} "[5.] The jury erred to the prejudice of the defendant-appellant when it returned a verdict of guilty on counts one, two, five, and seven, against the manifest weight of the evidence."

### Juror Misconduct

{¶37} In his first assignment of error, Mr. O'Neil contends that the trial court violated his right to a fair trial and an impartial jury by how it investigated potential juror misconduct.

{¶38} "The Sixth Amendment to the United States Constitution mandates that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury[.]' Beyond this, the United States Supreme Court interpreted the Due Process Clause of the Fourteenth Amendment to the United States Constitution as requiring that a defendant accused of a state criminal violation be tried before a panel of fair and impartial jurors. *Duncan v. Louisiana* (1968), 391 U.S. 145, 88 S.Ct. 1444, 20

10

L.Ed.2d 491. See, also, Section 10, Article I, Ohio Constitution, (establishing the right to 'a speedy public trial by an impartial jury')." *State v. Jaryga*, 11th Dist. Lake No. 2003-L-023, 2005-Ohio-352, ¶ 72.

{¶39} "It is a long-standing rule * * * that [a reviewing court] will not reverse a judgment because of the misconduct of a juror unless prejudice to the complaining party is shown." *State v. Kehn*, 50 Ohio St.2d 11, 19, 361 N.E.2d 1330 (1977). "Therefore, the analysis of a claim of jury misconduct requires a two-step inquiry. First, there must have been misconduct by a juror. Second, the court must determine whether such misconduct materially affected the substantial rights of the defendant." *Jaryga* at ¶ 75.

{¶40} "[B]ecause the trial court is in the best position to determine the nature and extent of alleged jury misconduct, the trial court's decision on the scope of proceedings necessary to investigate the allegation is reviewed only for an abuse of discretion." *Id.*; *see State v. Fears*, 86 Ohio St.3d 329, 337-338, 715 N.E.2d 136 (1999) (acknowledging that appellate courts are to show deference to the trial court, which is in the best position to observe the jurors); *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 163 (acknowledging that the trial court is permitted to rely on a juror's testimony in determining impartiality).

{¶41} Because Mr. O'Neil did not express dissatisfaction with the trial court's handling of the alleged jury misconduct, however, he has waived all but plain error. *See State v. Sanders*, 92 Ohio St.3d 245, 253, 750 N.E.2d 90 (2001). "Under this standard, the defendant bears the burden of 'showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice.'" *State v. West*, 168 Ohio St.3d 605, 2022-

11

Ohio-1556, 200 N.E.3d 1048, ¶ 22, quoting *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16.

{¶42} Mr. O'Neil objects to the fact that the trial court questioned the jurors in the intern's presence. According to Mr. O'Neil, this resulted in the intern "hedging" on her previous report. Therefore, he argues, the trial court should have ordered the separation of witnesses as it did for the trial witnesses.

{¶43} We acknowledge the intern appeared to change her initial report upon questioning from the parties. For instance, she reported the jurors saying, "he wouldn't stop talking," but later denied making that statement. However, the lack of a separation order was not necessarily the cause of the discrepancy. The purpose of a trial order for the "exclusion" or "separation" of witnesses is "to limit the possibility that the witnesses' testimony might be influenced by the accounts of other witnesses." 2003 Staff Notes to Evid.R. 615. Here, the trial court wanted the intern to address the accuracy of the jurors' responses, which necessarily required her to hear their responses. The most efficient method was for the intern to directly observe the trial court's questioning. Ultimately, it was the trial court's duty to assess the jurors' credibility and determine whether they had engaged in misconduct. Based on the record before us, we cannot say that a separation order would have changed the outcome of the trial court's investigation or that the lack thereof created a manifest injustice.

{¶44} Mr. O'Neil also objects to the substance of the trial court's questioning, asserting it "was so vague that it failed to address the potential misconduct." Specifically, he contends that one juror "seemed to not really understand what the trial court was

Case No. 2023-L-050

asking" and that the trial court never directly asked the jurors whether they had spoken about Mr. O'Neil or developed beliefs about him.

{¶45} We find no plain error regarding the substance of the trial court's questions. The "vague" question to which Mr. O'Neil refers occurred when the trial court asked the first juror whether she had discussed anything "about the contents or the quality of the presentations * * * [f]or the last witness," i.e., Mr. O'Neil. The juror responded, "I can't think of anything I would have said pertaining to the case, if that's what you are referring to." The juror's response indicates she sufficiently comprehended the court's question. Further, the jurors' denials about discussing the case necessarily encompassed denying making negative statements about Mr. O'Neil. Therefore, the trial court had no reason to ascertain whether the jurors had exhibited bias or prejudice against Mr. O'Neil.

{¶46} Accordingly, Mr. O'Neil has not established plain error regarding how the trial court investigated potential juror misconduct. His first assignment of error is without merit.

**Mistrial**

{¶47} In his second assignment of error, Mr. O'Neil contends the trial court erred by failing to declare a mistrial based on juror misconduct.

{¶48} "A mistrial should only be declared when justice so requires and a fair trial is no longer possible." *Jaryga* at ¶ 76. "[T]he decision whether to grant or deny a motion for a mistrial * * * rests within the sound discretion of the trial court." *Id.* Because Mr. O'Neil did not request a mistrial, however, we review only for plain error. *See State v. Kaseda*, 11th Dist. Lake No. 2002-L-002, 2004-Ohio-1074, ¶ 22.

13

Case No. 2023-L-050

{¶49} Mr. O'Neil contends that the jury committed "clear misconduct" by talking about him and his testimony. Therefore, he argues, the trial court's failure to declare a mistrial constituted plain error and created a manifest miscarriage of justice. In support, Mr. O'Neil cites *State v. Pulido*, 11th Dist. Lake No. 2021-L-059, 2022-Ohio-433. In that case, an assistant public defender who was not involved in the trial informed the court that she overheard a conversation between two jurors during a break in the state's case-in-chief. *Id.* at ¶ 33. The trial court and counsel individually questioned the two jurors, and both denied discussing the case. *Id.* at ¶ 34. The trial court found that neither juror was credible and assigned them as alternates. *Id.* at ¶ 35.

{¶50} *Pulido* is readily distinguishable. In *Pulido*, the trial court found the jurors' denials were not credible and, thus, that they had engaged in misconduct. Here, the trial court apparently found the jurors' denials were credible and, thus, that they had not engaged in misconduct. Without a predicate finding of juror misconduct, there was no basis for the trial court to declare a mistrial.

{¶51} Accordingly, Mr. O'Neil has not established plain error regarding the trial court's failure to declare a mistrial. His second assignment of error is without merit.

### Sufficiency of the Evidence

{¶52} We review Mr. O'Neil's remaining assignments of error out of order.

{¶53} In his fourth assignment of error, Mr. O'Neil contends the trial court erred by denying his Crim.R. 29(A) motion for acquittal.

{¶54} Crim.R. 29(A) provides that "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint,

14

if the evidence is insufficient to sustain a conviction of such offense or offenses." "Thus, when an appellant makes a Crim.R. 29 motion, he or she is challenging the sufficiency of the evidence introduced by the state." *State v. Patrick*, 11th Dist. Trumbull Nos. 2003-T-0166 and 2003-T-0167, 2004-Ohio-6688, ¶ 18.

{¶55} "'"Sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy." *Id.* "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "[T]he claim of insufficient evidence invokes a question of due process, the resolution of which does not allow for a weighing of the evidence." *State v. Rose*, 11th Dist. Lake No. 2014-L-086, 2015-Ohio-2607, ¶ 33.

{¶56} Although Mr. O'Neil asserts the evidence was insufficient on all four charges for which he was found guilty, he only presents arguments regarding count 2 (aggravated burglary) and count 5 (kidnapping). Thus, we address only those two charges.

15

## Aggravated Burglary

{¶57} In count 2, Mr. O'Neil was convicted of aggravated burglary in violation of R.C. 2911.11(A)(1), which provides, in pertinent part, "[1] No person, by force, stealth, or deception, [2] shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, [3] with purpose to commit in the structure * * * any criminal offense, [4] if * * * [t]he offender inflicts, or attempts or threatens to inflict physical harm on another[.]"  The term "trespass" includes "[k]nowingly enter[ing] or remain[ing] on the land or premises of another * * * without privilege to do so * * *."  R.C. 2911.21(A)(1); *see* R.C. 2911.10 (element of trespass in aggravated burglary defined as offense of criminal trespass).

{¶58} Mr. O'Neil contends there was insufficient evidence that he trespassed in Mr. Denslow's home.  He argues that "the evidence" supports he was an invited guest, noting that Mr. Denslow acknowledged drinking a beer and smoking a cigarette during the incident.

{¶59} Mr. O'Neil's argument fails to view the evidence in a light most favorable to the prosecution, as required, and also mischaracterizes Mr. Denslow's testimony.  Mr. Denslow expressly testified that he did *not* invite Mr. O'Neil into his home and that he did not even know Mr. O'Neil was there until Mr. O'Neil opened his door.  While Mr. Denslow testified that he drank a beer and smoked a cigarette during the encounter, he stated that he only did so with Mr. O'Neil's permission to avoid the possibility of additional physical harm.

{¶60} Mr. O'Neil also contends there was insufficient evidence that he was present to commit a criminal offense or to inflict or attempt to inflict physical harm.

16

According to Mr. O'Neil, the "stories of what occurred were all over the board." However, his and Ms. Hefner's versions of events were similar, while Mr. Denslow only went to the police upon the urging of Mr. Payerchin, who was suspected of drugging Ms. Hefner.

{¶61} Mr. O'Neil's argument asks us to weigh the conflicting testimony, which is not permitted in a sufficiency analysis. Mr. Denslow testified that after Mr. O'Neil trespassed, he kneed Mr. Denslow in the chest and arm, punched him in the face, choked him, cut him with a knife, and forced him to ingest pills. These acts constitute criminal offenses and the actual or attempted infliction of physical harm. Accordingly, the state presented sufficient evidence, if believed, to establish the elements of aggravated burglary in violation of R.C. 2911.11(A)(1) beyond a reasonable doubt.

### *Kidnapping*

{¶62} In count 5, Mr. O'Neil was convicted of kidnapping in violation of R.C. 2905.01(B)(2), which provides, in pertinent part, "[1] No person, by force, threat, or deception, * * * [2] shall knowingly do any of the following, under circumstances that create a substantial risk of serious physical harm to the victim * * *: * * * [3] Restrain another of the other person's liberty."

{¶63} Mr. O'Neil contends there was insufficient evidence that he restrained Mr. Denslow or that there was a substantial risk of serious physical harm. He notes that based on Mr. Denslow's own testimony, he was given access to a phone, was in an apartment complex with nearby neighbors, and "freely" drank beer and smoked a cigarette during the incident.

{¶64} Once again, Mr. O'Neil's argument involves the weight of the evidence rather than its sufficiency and mischaracterizes Mr. Denslow's testimony. Mr. Denslow

17

testified that he used the phone twice but only at Ms. Hefner's and Mr. O'Neil's direction. As explained above, he did not testify to "freely" drinking a beer and smoking a cigarette; he did so with Mr. O'Neil's permission. In addition to Mr. O'Neil's actual infliction and attempts to inflict physical harm, Mr. Denslow testified that Mr. O'Neil told him multiple times that he was "going to die tonight." Accordingly, the state presented sufficient evidence, if believed, to establish the elements of kidnapping in violation of R.C. 2905.01(B)(2) beyond a reasonable doubt.

{¶65} Mr. O'Neil's fourth assignment of error is without merit.

### Manifest Weight of the Evidence

{¶66} In his fifth assignment of error, Mr. O'Neil contends his convictions on counts 2 (aggravated burglary) and 5 (kidnapping) are against the manifest weight of the evidence.

{¶67} "[W]eight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "In other words, a reviewing court asks whose evidence is more persuasive—the state's or the defendant's?" *Id.* "'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury [or trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins*, *supra*, at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution

18

of the conflicting testimony." *Id.*, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).

{¶68} "'[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * * If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978). "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶69} Mr. O'Neil contends that Mr. Denslow's version of the events was "incredible" and "fantastic." However, the believability of his testimony depended in large part on his credibility and that of the other witnesses. "The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). "A fact finder is free to believe all, some, or none of the testimony of each witness appearing before it." *State v. Fetty*, 11th Dist. Portage No. 2011-P-0091, 2012-Ohio-6127, ¶ 58.

{¶70} Here, the jury apparently believed some of Mr. Denslow's testimony by finding Mr. O'Neil guilty on four of the nine charges. Mr. Denslow's version of events was corroborated in many respects by the testimony of other witnesses, the medical testimony

19

Case No. 2023-L-050

and records, the call logs, and the surveillance video of Mr. Denslow's apartment complex. By contrast, Mr. O'Neil and Ms. Hefner's testimony contained material inconsistencies that may have raised questions in the minds of the jurors regarding their credibility. While Mr. O'Neil's testimony focused heavily on Mr. Payerchin's alleged drugging of Ms. Hefner, that conduct was not established, nor would it have constituted a defense to Mr. O'Neil's criminal offenses. Upon review of the record, the jury did not clearly lose its way and create a manifest miscarriage of justice.

{¶71} Accordingly, Mr. O'Neil's convictions are not against the manifest weight of the evidence, and his fifth assignment of error is without merit.

### Ineffective Assistance of Counsel

{¶72} In his third assignment of error, Mr. O'Neil contends he received ineffective assistance of trial counsel.

{¶73} "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction * * * has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Specifically, "the defendant must show that counsel's representation fell below an objective standard of reasonableness * * * considering all the circumstances." *Id.* at 688. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." *Id.* at 689. "Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the

20

defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. In other words, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

### *Harmful Testimony*

{¶74} Mr. O'Neil contends his trial counsel was ineffective for opening the door to harmful testimony from Dr. Pokersnik. By asking the doctor whether bronchitis could have caused the redness in Mr. Denslow's eye, defense counsel allowed the state to elicit testimony indicating choking could have been the cause.

{¶75} Mr. Denslow reported to Dr. Pokersnik that Mr. O'Neil punched him in the face and choked him. In his cross-examination of Dr. Pokersnik, it appears defense counsel attempted to create reasonable doubt as to whether Mr. O'Neil was the actual cause of Mr. Denslow's apparent injuries. Thus, defense counsel's questioning was a matter of trial strategy. "[D]ecisions on strategy and trial tactics are generally granted wide latitude of professional judgment, and it is not the duty of a reviewing court to analyze the trial counsel's legal tactics and maneuvers." *State v. Hope*, 2019-Ohio-2174, 137 N.E.3d 549, ¶ 90 (11th Dist.). "We will not second-guess trial strategy decisions that backfired." *Id.* at ¶ 95. Thus, "[d]ebatable trial tactics generally do not constitute a deprivation of effective counsel." *State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995).

{¶76} Mr. O'Neil also contends his trial counsel was ineffective for opening the door to harmful testimony from Det. Butler, who was one of the investigating detectives.

21

By asking Det. Butler about inconsistencies between Mr. O'Neil's and Ms. Hefner's statements to the police, defense counsel allowed the state to impeach Ms. Hefner before she even testified.

{¶77} It is accepted trial strategy for a party to "draw the sting" of cross-examination by bringing out, on direct examination, facts that tend to discredit that party's own witness. *State v. Johnson*, 11th Dist. Ashtabula No. 2009-A-0050, 2010-Ohio-3046, ¶ 36; *see also State v. Tyler*, 50 Ohio St.3d 24, 34, 553 N.E.2d 576 (1990). "This is not done to impeach the witness, but to present an image of candor to the trier of fact." *Tyler* at 34. Thus, we do not find deficient performance in defense counsel's choice to "draw the string."

### Juror Misconduct

{¶78} Mr. O'Neil next contends his trial counsel was ineffective for failing to move for removal of the two jurors or a mistrial. Mr. O'Neil's argument is predicated on a finding that the two jurors engaged in misconduct. Since the trial court made no such finding, trial counsel was not deficient for failing to make either motion.

{¶79} Mr. O'Neil also contends his trial counsel was ineffective for failing to move for a separation order during the trial court's questioning of the jurors. According to the Supreme Court of Ohio, plain error and ineffective assistance of counsel claims employ the same deferential standard of review regarding the element of prejudice. *See State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. Since Mr. O'Neil has not established prejudice resulting from the trial court's failure to issue a separation order, he cannot establish ineffective assistance of counsel on the same issue.

22

Case No. 2023-L-050

### *Prior Convictions*

{¶80} Finally, Mr. O'Neil contends his trial counsel was ineffective for failing to address on direct examination his prior conviction for attempted felonious assault and one of the defense witness' prior convictions for crimes of dishonesty. As a result, the state was able to use these prior convictions for impeachment purposes on cross-examination.

{¶81} This court has held that "[w]hether to 'draw the sting' regarding prior convictions on direct examination or allow that information to come into the record on cross-examination is a matter of trial strategy. It is not a measure of reasonable representation." *Johnson*, *supra*, at ¶ 37. Therefore, we do not find deficient performance in defense counsel's choice not to "draw the string."

{¶82} Accordingly, Mr. O'Neil has not established ineffective assistance of trial counsel, and his third assignment of error is without merit.

{¶83} For the foregoing reasons, the judgment of the Lake County Court of Common Pleas is affirmed.


MATT LYNCH, J.,

JOHN J. EKLUND, J.,

concur.

Case No. 2023-L-050