[Cite as *State v. Roberts*, 2024-Ohio-2957.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

STATE OF OHIO,

      Plaintiff-Appellee,

- vs -

GAVIN ROBERTS,

      Defendant-Appellant.

CASE NO. 2023-T-0097

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2023 CR 00244

## O P I N I O N

Decided: August 5, 2024
Judgment: Affirmed

*Dennis Watkins*, Trumbull County Prosecutor, and *Ryan J. Sanders*, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481 (For Plaintiff-Appellee).

*Edward F. Borkowski, Jr.*, P.O. Box 609151, Cleveland, OH 44109 (For Defendant-Appellant).

EUGENE A. LUCCI, P.J.

{¶1} This appeal emanates from a jury trial after which appellant, Gavin Roberts ("Roberts"), was convicted of one count of Aggravated Murder with a Firearm Specification and one count of Aggravated Robbery with a Firearm Specification. Roberts challenges the weight of the evidence, the trial court's decision to allow prior testimony from an unavailable witness, the trial court's denial of Roberts' motion for a mistrial, and the trial court's imposition of sentence. We affirm.

{¶2} On the evening of November 19, 2022, Blair Legg ("Ms. Legg") along with her live-in boyfriend, Brice Hilton ("the victim") traveled in her Nissan Versa from Sharon, Pennsylvania, to Warren, Ohio. The victim was interested in buying a used cell phone for his son's birthday from a seller located in Trumbull Homes, a "housing project." En route to Warren, the couple stopped at a Speedway gas station so Ms. Legg could withdraw money for the purchase. She withdrew $140.00 and gave the money to the victim. According to Ms. Legg, the victim had money on his person, but the withdrawal was to cover the remaining cost of the phone.

{¶3} After leaving the gas station, the victim received a call, apparently from the seller. According to Ms. Legg, the victim stated, "Yes, we're coming. We're on Market Street." At approximately 8:00 p.m., they arrived at Trumbull Homes. They observed a vehicle parked next to the curb, and the couple parked behind the vehicle. The victim, who was driving, exited from the driver's side door of the Nissan, and two individuals exited the other vehicle.

{¶4} Ms. Legg stated the victim met the two individuals, one of whom was later identified as Mr. Roberts, in front of her Nissan and one of the individuals produced a box and passed it to the victim. The victim returned the box, halfway open as it contained no phone. The victim began to walk away towards the Nissan at which point Ms. Legg heard "pop, pop, pop." Ms. Legg heard the victim say "no," which was followed by an additional "pop." Ms. Legg stated she did not observe a firearm being shot but saw Roberts with his arm extended outward. She additionally stated she observed the second individual with nothing in his hands.

2

{¶5} Officer Lance Adkins of the Warren Police Department received a "shots fired" call in the area of Trumbull Homes. Upon arrival, he found the victim lying near a vehicle in the street with blood flowing from his head. A second officer administered CPR, and Officer Adkins assisted Ms. Legg, who was soaked in blood. The officer indicated Ms. Legg was "completely hysterical," both crying and screaming. Officer Adkins eventually transported Ms. Legg to the Warren Police Department.

{¶6} Officer Taylor Edwards of the Warren Police Department also responded to the "shots fired" call. The officer stated she observed a gunshot wound to the victim's head. The victim was breathing shallowly, but was still alive. When the officer spoke with Ms. Legg, the latter explained why the couple was at the scene. She further stated that two light-skinned males wearing hoodies, one in black and one in gray, with face masks exited the vehicle. Additionally, even though each individual wore hoodies and masks, Ms. Legg stated she noticed a conspicuous "cross" tattoo near the eye area of the individual wearing the gray hoodie. After the exchange of the purported phone failed and the victim turned around, Ms. Legg stated the male in the black hoodie began to shoot the victim.

{¶7} Sergeant Thad Stephenson responded to the shooting call. Once on the scene, he commenced to secure the area. After the victim was taken to the hospital, the sergeant went to the emergency room to determine the victim's status. Sergeant Stephenson learned the victim was declared deceased at 8:26 p.m.

{¶8} Shortly thereafter, the sergeant received a call reporting a male had entered a residence on Oak Knoll in Warren, Ohio, with a weapon. The caller, the homeowner, along with others had the individual detained. Officers responded and the male was taken

3

into custody. The homeowner informed Sergeant Stephenson that he had taken a firearm and a jacket from the suspect, each of which were collected as evidence.

{¶9} William Cole, Sr. ("Mr. Cole"), the caller, stated his son, William Cole, Jr. (a.k.a. "Deuce") was acquainted with Roberts (who Mr. Cole knew only as "Zo") as well as a third individual named Carter Hall ("Mr. Hall"). Mr. Cole asserted he had been introduced to Roberts by his son, but asserted he did not know Roberts well. As such, he expressly stated Roberts was not freely welcome in his house, especially if he did not knock before entering.

{¶10} On the evening of the incident, Deuce and Mr. Hall arrived at Mr. Cole's home. Mr. Cole indicated the young men were "scared" and "petrified." The men retreated to the basement where they related the events to Mr. Cole, explaining that Roberts had shot someone. And after the shooting, they both fled the scene. Mr. Cole advised the young men they must go to the police. While speaking with them, Mr. Cole called a neighbor and friend, "Joey," and asked the man to come to the house to assist with the situation.

{¶11} Subsequently, Mr. Cole's wife was heard screaming that someone had entered the house unannounced. Mr. Cole hastened up the steps and found Roberts. Roberts asked where Deuce and Mr. Hall were. Mr. Cole pulled out his firearm and disarmed Roberts. Mr. Cole stated he took Roberts to the basement and advised Joey to watch him. Mr. Cole returned upstairs and placed Roberts' firearm and jacket in his gun safe. Mr. Cole called police and, while waiting for officers, Roberts asserted he acted in self-defense because "the man took a step."

4

{¶12} Later, Mr. Cole found "like $200.00" in the basement where Roberts was seated. He collected the money and acknowledged it was not his. He subsequently turned it over to police.

{¶13} Deuce stated that the three young men drove to Trumbull Homes on the night of the incident so Roberts could sell a phone. Mr. Hall was the driver, Deuce was the passenger, and Roberts was in the back seat. When a vehicle pulled up, Roberts and Mr. Hall exited the vehicle, while Deuce stayed in the passenger seat. While on his phone, Deuce heard a "bang." He looked over towards the scene and observed Roberts shoot the victim. Mr. Hall ran back to the car and the two drove away leaving Roberts behind. The young men eventually stopped the car, left it, and ran to Mr. Cole's residence.

{¶14} Prior juvenile-court testimony of Mr. Hall was read into the record based upon his unavailability as a witness. Mr. Hall stated he was familiar with Roberts but had not met him in person until the day of the incident. Roberts told Mr. Hall he had a cell phone he needed to sell, and the young men drove to the area where the incident took place. Roberts asked Mr. Hall to get out of the vehicle with him because he had apparently been robbed before. Roberts explained that an African American male was coming from Pennsylvania to buy the phone.

{¶15} Upon the arrival of Ms. Legg and the victim, both young men exited the vehicle. Mr. Hall unboxed the phone and gave the phone box back to Roberts before it was passed to the victim. When the victim realized there was nothing in the box, Roberts shot him. Mr. Hall stated that it looked like he was shot "in the chest from how he was holding himself when he hit the ground." Mr. Hall recounted that he and Roberts were on the sidewalk, and when Roberts shot the victim, he fell "[b]ackwards into the road." Mr.

5

Hall was unequivocal that Roberts shot the victim and after the first shot, approached him and shot the fallen man two more times. According to Mr. Hall, Roberts then searched the victim's wallet.

{¶16} Mr. Hall retreated to his car and drove away with Deuce. Mr. Hall asserted he was looking for guidance from an adult. They returned to Mr. Cole's house where Roberts eventually appeared and was arrested.

{¶17} Kevin Kramer ("Mr. Kramer"), a forensic scientist in the firearm section of BCI, conducted various firearm examinations with the firearm allegedly used in the murder. Mr. Kramer conducted an operability test and found it fully operable. Mr. Kramer compared the projectiles recovered from the victim's body and the round he had test fired. He concluded that each of the projectiles recovered from the victim were fired from the firearm in question.

{¶18} Detective Michael Altiere ("Detective Altiere") of the Warren Police Department conducted an analysis of Roberts' recovered cell phone. The detective explained his process of examining the cell phone to the jury. Detective Altiere stated he pulled photos from Roberts' phone depicting a .38 special revolver-style pistol. The photos were "very similar" to the firearm allegedly used in the homicide and were taken in late July 2022. Additionally, other photos extracted from "metadata" on the phone depicted Roberts "posing" with the firearm on November 14, 2022, five days before the homicide.

{¶19} The matter proceeded to the Trumbull County Court of Common Pleas, Juvenile Division. A probable cause hearing was held. Roberts was advised that, based upon the charged offenses, if the court found probable cause, he was subject to a

6

mandatory transfer of the case. The juvenile court found probable cause for each of the charged offenses, and Roberts' case was transferred to the Trumbull County Court of Common Pleas, General Division, to prosecute him as an adult.

{¶20} The Trumbull County Grand Jury subsequently returned a four-count indictment charging Roberts with Count 1: Aggravated Murder with a Firearm Specification, an unclassified felony, in violation of R.C. 2903.01(B) and (G) and R.C. 2941.145; Count 2: Aggravated Robbery with a Firearm Specification, a felony of the first degree, in violation of R.C. 2911.01(A)(1) and (C) and R.C. 2941.145; Count 3: Aggravated Burglary with a Firearm Specification, a felony of the first degree, in violation of R.C. 2911.11(A)(2) and (B) and R.C. 2941.145; and Count 4: Aggravated Murder with a Firearm Specification, an unclassified felony, in violation of R.C. 2903.01(A) and (G) and R.C. 2941.145.

{¶21} A jury trial commenced, and the jury returned verdicts of guilty on Counts 1 and 2 of the indictment, as well as the accompanying firearm specifications. The jury, however, acquitted Roberts of the offenses charged in Counts 3 and 4 of the indictment.

{¶22} At sentencing, the trial court ordered Roberts to serve a minimum of 25 years to life in prison, with a mandatory additional three years for the Firearm Specification to be served prior to and consecutively with the underlying offense, on Count 1. On Count 2, the court ordered Roberts to serve a minimum term of 11 years up to a maximum of 16 and one-half years, with a mandatory additional three years on the Firearm Specification to be served prior to and consecutively with the underlying offense. The trial court ordered the prison terms to be served consecutively with each other for a total term of 42 years to 47 and one-half years up to a maximum of life in prison.

7

{¶23} Roberts now appeals and assigns four errors for our review. His first asserts:

{¶24} "Appellant's convictions were against the manifest weight of the evidence."

{¶25} "[W]eight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 2007-Ohio-2202, ¶ 25. "In other words, a reviewing court asks whose evidence is more persuasive—the state's or the defendant's?" *Id.* "'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered.'" *State v. Thompkins*, 1997-Ohio-52, 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "[A] manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." (Citations omitted.) *State v. Messenger*, 2022-Ohio-4562, at ¶ 26.

{¶26} Roberts was found guilty of aggravated felony murder, in violation of R.C. 2903.01(B), which provides, in relevant part, that Roberts "purposely cause[d] the death of another . . . while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit . . . aggravated robbery . . . ." He was also found guilty of aggravated robbery, which provides Roberts, "in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following . . . [had] a deadly weapon on or about the [his] person or under the [his] control and either display[ed] the weapon,

8

brandish[ed] it, indicate[d] that the offender possesses it, or use[d] it[.]" R.C. 2911.01(A)(1).

{¶27} Roberts makes various arguments challenging the credibility of the State's evidence. We shall structure our analysis by setting forth the arguments in turn. He initially challenges the credibility of the eye-witness evidence.

{¶28} Roberts first contends that Ms. Legg never met him and could not identify him as the shooter on the night in question. Roberts also asserts that although Ms. Legg observed the shooter extend his arm, she did not observe a firearm. Moreover, Roberts emphasizes Ms. Legg testified that, after the shooting, she did not know "where everyone went." She explained, however, to Officer Adkins that, at the scene, both suspects got back into their vehicle and drove toward Hazelwood Avenue. He maintains these versions of events cannot be reconciled.

{¶29} We fail to see how Ms. Legg's version of events lacks credibility. While it is true she admitted she was unfamiliar with Roberts as well as the area, this does not necessarily imply she was unable to provide a sound rendition of what she witnessed. She observed the person in the black hoodie, i.e., Roberts, with his arm extended. Although this is not tantamount to seeing a firearm, it provides unique circumstantial evidence, given the surrounding circumstances, that Roberts was the gunman who murdered the victim. She testified:

> As we pulled up, there was a vehicle already parked basically on the curb pulled up to, like the sidewalk curb area. And I asked [the victim] was that them and he said, yeah, I'm pretty sure. So then he proceeded to say I'll be right back. Two people got out of the parked vehicle in front of us. I asked [the victim] why are two people getting out and he said he wasn't sure. So I said okay. They proceeded - - [the victim] proceeded to walk in front of my car and they moved off from

9

this - - the front of my car onto the sidewalk on my right side so I could still see from my driver's side view through the passenger seat and through the driver window. They presented him with the phone box and after a few minutes of going back and forth passing the phone box around, [Roberts] handed [the victim] the box halfway open and [the victim] looked at it and there was no phone in there so he proceeded to give the box back to them and walk away.

At that time, I heard pop, pop, pop as [Roberts] was walking in front of my car towards the area that [the victim] was at. I looked at the other gentleman that was out with [Roberts] and he was huddled down with his arms over his head . . . . As I leaned over, I heard [the victim] say, no, and then I heard a pop. And at that time, the only thing I thought to do was blow my horn to try to stop anything further going on. At that point, I tried to get out of my vehicle to get to [the victim] but my safety lock was on so it took a few minutes. By the time I got to [the victim], he was unresponsive. I called 911 and tried to perform CPR in efforts to save him.

{¶30} Even though Ms. Legg had never met Roberts or Mr. Hall, she testified she noticed a distinctive marking on the face of one of the individuals, namely a cross tattoo by his eye on his face. She testified that the individual with the cross tattoo was not the person who she perceived shot the victim. Mr. Hall testified at the juvenile hearing that, at the time of the incident, he had (and still has) the cross tattoo under his eye.

{¶31} Under the stress and terror of the incident, Ms. Legg's observations were not so vague or far-fetched as to render her testimony unpersuasive.

{¶32} Additionally, although Roberts deems Ms. Legg's description of how the suspects left the scene irreconcilable, she could easily not know "where everyone went," and still believe she saw the suspects re-enter the vehicle. She would have no reason to know the next destination of the suspects. And it is not unreasonable for her to mistakenly report that the suspects retreated to the vehicle. Mr. Hall and Deuce did drive away. While, according to Mr. Hall, Roberts remained at the scene, Ms. Legg may have believed, under

10

the pressure and distress of being present and observing the homicide, that he fled with the others. The evidence Ms. Legg presented in this respect is not irreconcilable.

{¶33}   Next, Roberts takes issue with Deuce's rendition of events.  Deuce testified that on the evening of the incident, Mr. Hall's girlfriend picked him up. He did not, however, mention until cross-examination that Roberts was also with him. Deuce also explained to the juvenile court judge that he did not remember when he first met Roberts; at trial, however, Deuce testified that he had known Roberts for a couple/three months. Roberts contends Deuce's testimony demonstrates an implicit interest in distancing himself from Roberts and accordingly could not be deemed credible. He makes a similar argument as it relates to Mr. Cole's testimony.

{¶34}   Roberts also points out that Deuce's testimony reflects that he was in the passenger seat of the vehicle driven by Mr. Hall. And the incident took place at night with Ms. Legg's headlights on such that, Roberts contends, it would be difficult for him to see the shooting. Deuce nevertheless testified that, upon hearing gunshots, he first ducked, then he turned around and was able to see Roberts continue shooting the victim. Roberts submits the testimony is not believable.

{¶35}   While the testimony may reflect certain minor details or omissions, e.g., failure to mention Roberts was with him when Deuce's girlfriend picked them up, such details do not fundamentally undermine the remaining, consistent features of his statement of events. This is equally true for his testimony at trial and at the juvenile probable cause hearing. Even if he could not remember specifically at trial when he met Roberts, this does not weaken the great balance of his testimony relating to his observations of the substantive crimes.

11

{¶36} Moreover, we fail to see how Deuce would be in any way precluded from observing Roberts fire the final shot or shots. Simply because Ms. Legg's headlights were activated does not necessarily mean an observer of an event was being entirely blinded. We discern no meaningful issue with the credibility of Deuce's overall testimony.

{¶37} Furthermore, Robert's challenge to Mr. Cole's version of events is also unavailing. Mr. Cole claimed that he had only known Roberts for a week or two. Roberts argues, however, that he was hanging out at Mr. Cole's house on the date of the incident and was adequately familiar with the residence to find it on foot after the incident. We do not view Mr. Cole's statement regarding the length of time he knew Roberts as strange or inconsistent with Roberts' presence in the home or Mr. Cole's unfamiliarity with Roberts. It is reasonable to conclude that a homeowner may not be familiar with each of his or her children's friends or associates. That Mr. Cole did not know Roberts well does not affect the credibility of his testimony when viewed in its totality.

{¶38} Next, Roberts' challenges Mr. Hall's credibility. At the juvenile court probable cause hearing, Mr. Hall testified that, after the homicide, he and Deuce drove down the road to speak with a friend because he was in shock and did not know what to do. Roberts asserts the mention of the anonymous friend renders Mr. Hall's version not credible. Roberts further cites Mr. Hall's testimony that he and Deuce drove to Mr. Cole's house after the incident. Roberts maintains this is different from Deuce's version that describes the young men running back to Mr. Cole's house.

{¶39} We do not view the minor inconsistencies between Mr. Hall's and Deuce's testimony, let alone the lack of attention he gave to the friend with whom he wished to speak, inherently problematic. The testimony demonstrates that the event the young men

12

witnessed was emotionally taxing. Under circumstances such as the case at bar, slight differences in recollection of certain events is reasonably understandable. The primary features of each individual's testimony were consistent and, as a result, we decline to conclude the evidence was not credible.

{¶40} Next, Roberts challenges the physical evidence supporting the convictions. He argues that even though the bullets that killed the victim came from the firearm that Mr. Cole confiscated from Roberts and was the same firearm Roberts took photos with on his phone, this does not necessarily imply he fired the fatal shots. While Roberts ' claim is technically correct, the *manifest weight* of the eyewitness evidence, the physical evidence, and circumstantial evidence, taken together, supports the jury's verdict beyond a reasonable doubt.

{¶41} Roberts' first assignment of error lacks merit.

{¶42} His second assignment of error provides:

{¶43} "The trial court erred by permitting the state to present hearsay evidence in the form of prior testimony of a witness pursuant to Evid.R. 804(B)."

{¶44} Under this assignment of error, Roberts contends the trial court erred by permitting the prior testimony of Mr. Hall. In particular, Roberts claims the trial court committed reversible error by declaring Mr. Hall to be unavailable so that the State could introduce his prior testimony before the juvenile court. Roberts asserts the State's attempts at locating and serving a subpoena on Mr. Hall in order to secure his testimony in person fell short of reasonable and good faith efforts. We disagree.

{¶45} Evid.R. 804(B)(1) provides:

> (B) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

13

(1) *Former Testimony.* Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. Testimony given at a preliminary hearing must satisfy the right to confrontation and exhibit indicia of reliability.

{¶46} Evid.R. 804(A)(5) states that a witness is unavailable if he or she "is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance . . . by process or other reasonable means."

{¶47} Further, the Supreme Court of Ohio has held:

As a predicate to the introduction of hearsay against a defendant in a criminal prosecution, the Confrontation Clause of the Sixth Amendment normally requires a showing that the hearsay declarant is unavailable despite reasonable effort made in good faith to secure his presence at trial.

Evid.R. 804(B)(1) permits the admissibility at trial of former testimony taken at a previous trial upon a showing that the witness is unavailable despite reasonable efforts made in good faith to secure his presence at trial.

A showing of unavailability under Evid.R. 804 must be based on testimony of witnesses rather than hearsay not under oath unless unavailability is conceded by the party against whom the statement is being offered.

*State v. Keairns*, 9 Ohio St.3d 228 (1984), paragraphs one through three of the syllabus.

{¶48} The prosecution, as the proponent of the evidence, bears the burden of establishing it engaged in a reasonable effort to procure the testimony of the proposed unavailable declarant. *Id.* at 232; *see also State v. Durst*, 1997 WL 799539, *3 (11th Dist. Dec. 26, 1997). Reasonable efforts do not imply the State must take "'every conceivable

14

Case No. 2023-T-0097

step'" to procure the declarant's presence. *State v. Leigh*, 2023-Ohio-91, ¶ 77 (2d Dist.), quoting *State v. Mitchell*, 2012-Ohio-3722, ¶ 14, (2d Dist.).

**{¶49}** While Roberts challenges the efforts and measures the State endeavored to take to procure the live testimony of Mr. Hall, he does not expressly take issue with whether the prior testimony met the requirements of Evid.R. 804(B)(1). We shall therefore limit our analysis of Roberts' specific contention and assume he concedes the juvenile court proceedings were sufficient to develop the testimony at issue in a manner that subjected Mr. Hall to adequate and vigorous cross-examination.

**{¶50}** During a hearing on the State's notice of intention to use the prior testimony, Detective Nicole Smith of the Warren Police Department testified to the efforts that were made to secure Mr. Hall's appearance. Detective Smith stated that, prior to trial, she had personally appeared at Mr. Hall's last known residence, as well as his mother's residence, in order to serve the subpoena. Hall was no longer living at either residence.

**{¶51}** The detective also testified to her awareness that the Trumbull County Sheriff's Department had previously attempted to locate Mr. Hall at his mother's residence and was also unsuccessful. Detective Smith stated she was informed that Mr. Hall had outstanding municipal court warrants for aggravated burglary and domestic violence. Given these charges, one of which is a felony, the Detective stated she received information that Mr. Hall may have left the State of Ohio.

**{¶52}** Detective Smith testified she left "cards and information" at the residences so Mr. Hall could contact her regarding the subpoena if he returned. The detective also utilized the phone numbers of Mr. Hall's mother and the mother of Mr. Hall's children, to

15

no avail.  The detective found out that Mr. Hall did not have a phone. Despite the foregoing efforts, Mr. Hall could not be located.

**{¶53}** It also bears noting that, during the hearing, Roberts' counsel represented that he also attempted to serve Mr. Hall to appear on Roberts' behalf by performing residential service at his mother's residence. Roberts' counsel did not hear from Mr. Hall. The court, at the hearing, advised the State to similarly complete residential service in an effort to procure Mr. Hall's presence. The prosecutor agreed.

**{¶54}** At the hearing, the trial court reserved its final ruling upon the witness's unavailability until after he failed to appear on both the date contained in the State's subpoena as well as the date Roberts subpoenaed him. When Mr. Hall did not appear, the trial court declared him unavailable and allowed his prior testimony of his rendition of events from the juvenile court probable cause hearing, where he was subjected to both direct and cross-examinations.

**{¶55}** We conclude the record demonstrates that the State underwent reasonable, good-faith efforts to secure the witness's appearance at trial; this is underscored by Roberts' own inability to obtain the witness's live testimony. Therefore, the trial court did not err in permitting Mr. Hall's prior testimony to be admitted based upon his unavailability.

**{¶56}** Roberts' second assignment of error lacks merit.

**{¶57}** Roberts' third assignment of error contends:

**{¶58}** "The trial court erred by denying appellant's motion for a mistrial."

**{¶59}** Under this assigned error, Roberts argues the trial court erred in denying his motion for a mistrial after a "violent physical attack" occurred against him by a family

16

member of the victim during trial. Given the extent to which the trial court addressed the in-court physical outburst, we find this argument meritless.

{¶60} "'A mistrial should only be declared when justice so requires and a fair trial is no longer possible.'" *State v. O'Neil*, 2024-Ohio-512, ¶ 48 (11th Dist.), quoting State *v. Jayrga*, 2005-Ohio-352, ¶ 76 (11th Dist.). The decision to grant or deny a motion for a mistrial is a matter within the sound discretion of the trial court. *O'Neil* at ¶ 48. The mere existence of an irregularity does not warrant a mistrial. *State v. Treesh*, 2001-Ohio-4, 480, citing *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991) ("Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible."). Moreover, we presume that the jury followed the court's instructions to disregard the outburst. *Treesh* at 480.

{¶61} "When an emotional outburst takes place in court, the issue is whether the outburst 'deprived the defendant of a fair trial by improperly influencing the jury.'" *State v. Trimble*, 2009-Ohio-2961, ¶ 126, quoting *State v. Scott*, 2004-Ohio-10, ¶ 44. The question of whether an emotional outburst in a murder trial improperly influences the jury is a factual question to be resolved by the trial court. *State v. Benge*, 1999-Ohio-227, 144; *see also Trimble* at ¶ 126.

{¶62} "Absent clear evidence in the record that the outburst improperly affected the jury, only the trial judge can authoritatively determine whether the jury was disturbed, alarmed, shocked[,] or moved by the demonstration or whether the incident was of such a nature that it necessarily influenced the ultimate verdict of conviction." (Citation omitted.) *State v. Morales*, 32 Ohio St.3d 252, 255 (1987). Answering such questions "invariably depend upon facts and circumstances which a reviewing court cannot ordinarily glean

17

from the record." *Id.* Accordingly, the trial court determines, as a question of fact, whether the eruption deprived the defendant of a fair trial by inappropriately influencing the jury. *Id.* Without clear, affirmative evidence of such a deprivation, the trial court's ruling will not be disturbed. *Id.*

{¶63} Here, appellant offers no specific argument of improper influence and thus, we cannot conclude the outburst affected his right to a fair trial. Subsequent to the outburst, the trial court heard arguments regarding Roberts' motion for a mistrial. During the in-court hearing, the following occurred:

> [Defense Counsel]: Thank you, Judge. First of all, Judge, I'm not sure how the record actually reflects the events that recently occurred in the courtroom. But to summarize, during the testimony of Officer Adkins, a spectator from the gallery, who I believe is a relative of the victim, leapt over the railing and attacked my client, Gavin Roberts. There was a significant scuffle that occurred in front of the bench in the courtroom. The deputies and Officer Adkins were involved in subduing the suspect or assailant. My client was punched in the head. A taser was out, I don't know if it was deployed.
>
> The Court: It was not.
>
> [Defense Counsel]: Okay. Ultimately, the assailant was handcuffed and taken from the courtroom. Papers and files were strewn about and it was general chaos for a few moments. The jury was escorted out of the courtroom and now here we are. [Prosecutor], would you agree to that?

{¶64} The prosecutor agreed with the foregoing recitation of events and defense counsel moved for a mistrial, arguing:

> I believe that the events that transpired in the courtroom were at the extreme end of the emotional outburst type of events that are referred to in the Ohio caselaw. This is more than just someone yelling something, shouting something, being disruptive in the courtroom, this was a violent attack that required police officers and deputies to wrestle the assailant to the ground. My client was punched. The jury was,

18

understandably, shocked and appalled and I don't - - Judge, I don't know what effect that is going to have on the jury, whether that will be negative or positive toward my client, but it is going to have some effect on the jury. I think it will have an effect on everyone that was in the room. Certainly, jurors who are not used to being in this environment and dealing with these types of situations. I think that it is going to weigh on their minds. I think it will have a definite impact on the way they view the evidence, the weight they view these allegations and the way they view my client. We are not far into this trial. We picked a jury very quickly and we are only essentially less than a day into this trial because we didn't start until the afternoon yesterday. So I don't think that from a judicial economy standpoint it's not like we're at the end of the road on a week long trial or anything like that. I believe that the prudent course of action and, frankly, Judge, I'm, you know I'm trying to make a record. I think these events were dramatic. They're going to have an impact and my client is entitled to a fair trial unimpeded by these types of events.

{¶65} The court proceeded to provide a curative instruction to the jury and then polled the jury to determine if each one could set the outburst aside and determine the case based on the facts and evidence. The trial court voir dired each individual juror in chambers. After polling each member of the panel, the trial court dismissed the only juror who expressed distress, anxiety, and who could not say whether she could decide the case on the evidence and follow the legal instructions of the court. An alternate juror was seated, and the court again provided a curative instruction.

{¶66} This case is similar to *State v. Solomon*, 2021-Ohio-940 (8th Dist.), a matter upon which the State relied in opposing Roberts' motion for a mistrial. In *Solomon*, after a witness testified, he stepped down from the witness stand and attempted to physically attack the defendant at the defense table in front of the jury. *Id.* at ¶ 79. As the witness was escorted out, he shouted obscenities, also in front of the jury. *Id.* The trial court

19

ordered the jury to exit the courtroom. *Id.* at ¶ 80. After hearing arguments regarding defense counsel's motion for a mistrial, the court denied the motion. *Id.* at ¶ 80-83.

{¶67} On appeal, the defendant argued the incident was "'highly traumatic'" and that it was "'highly probable that many of the jurors never have experienced an act of violence in person and were negatively affected.'" *Id.* at ¶ 84. The Eighth District disagreed, finding that the trial court's ruling was not an abuse of discretion. *Id.* at ¶ 89. It noted it was unlikely that the witness's attempt to attack the defendant would elicit any sympathy for the victim or the witness. The court aptly observed: "In fact, the argument can be made that the incident benefitted appellant rather than prejudiced him." *Id.* It continued:

> [The witness's] outburst and attempt to attack appellant was more likely to have a negative impact on the jury's perception of [the witness] and his testimony than on the jury's perception of appellant. [The witness's] outburst may have even elicited sympathy for appellant, as [the witness] was the perpetrator of the attempted attack, and the appellant was the victim.

*Id* at ¶ 90.

{¶68} Finally, the Eighth District pointed out there was no indication that the jury was inappropriately influenced by the witness's outburst to the detriment of the defendant. Nor was there a suggestion that the verdict was a result of passion or prejudice resulting from the episode. Further, like this matter, the jury in *Solomon* did not find the defendant guilty on all counts charged in the indictment. This point underscored the jury was capable of weighing the evidence in an unbiased fashion towards the end of reaching a guilty verdict only on the evidence adduced at the trial.

{¶69} In this case, the trial court's polling of the jury demonstrated each juror (but for the juror who was dismissed) was capable of rendering his or her decision on the

20

evidence. Further, the trial court's curative instruction provided, in part that, "It is important, ladies and gentlemen, that you set everything aside and that you decide this case based upon the facts that come from this witness stand and the evidence that is introduced." Curative jury instructions are recognized as an effective means of remedying errors or irregularities that transpire during trial. *See State v. Zuern*, 32 Ohio St.3d 56, 61 (1987). And, as observed above, a jury is presumed to follow the instructions provided by the trial court. *Franklin*, 62 Ohio St.3d at 127.

{¶70} Given the dearth of evidence and argumentation that Roberts was prejudiced or suffered some form of unfairness in the trial court's ruling, we conclude the court did not abuse its discretion in denying Roberts' motion for a mistrial.

{¶71} Roberts' third assignment of error lacks merit.

{¶72} Roberts' fourth assignment of error asserts:

{¶73} "Appellant's sentence is contrary to law because the record does not clearly and convincingly support consecutive sentences."

{¶74} Under Roberts' fourth assignment of error, he asserts the trial court committed error by imposing consecutive sentences. He concedes the trial court made the required findings under R.C. 2929.14(C)(4) but claims the record fails to support the trial court's conclusion. In particular, Roberts argues he was merely 17 years old at the time of the incident and his prior juvenile record did not result in incarceration. As such, the trial court should not have relied "so heavily" on his past record. We do not agree.

{¶75} This court reviews felony sentences pursuant to R.C. 2953.08(G)(2). That subsection provides, in pertinent part:

> The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings

21

Case No. 2023-T-0097

underlying the sentence or modification given by the sentencing court.

The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

(a) That the record does not support the sentencing court's findings under division . . . (C)(4) of section 2929.14 [(regarding consecutive sentences)] . . . ;

(b) That the sentence is otherwise contrary to law.

{¶76} Pursuant to R.C. 2929.14(C)(4), separate prison terms for multiple offenses may be ordered to be served consecutively if the court finds it is necessary to protect the public from future crime or to punish the offender; that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and if the court also finds any of the factors in R.C. 2929.14(C)(4)(a)-(c) are present. Those factors include the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

22

{¶77} Because appellant concedes the trial court met its obligation to make the requisite R.C. 2929.14(C)(4) findings, and a review of the record supports this concession, we need not consider this component of the sentence. Instead, he claims the findings in support of the sentence were unsupported by the record. At sentencing, the trial court made the following statements on record:

> The court has considered the overriding principles and purposes of felony sentencing pursuant to 2929.11, which are to protect the public from future crime by this offender and to punish this offender and to promote the effective rehabilitation of the offender using the minimum sanctions that the Court determines accomplishes those purposes without imposing an unnecessary burden on the state of local government resources.
>
> I have reasonably calculated a sentence to achieve the two overriding purposes of felony sentencing and to be commensurate with and not demeaning to the seriousness of this offender's conduct and have further considered all relevant seriousness and recidivism factors. The sentence is proportional and consistent with sentences imposed for similar crimes committed by similar offenders.
>
> The court has considered the age of the defendant in arriving at this sentence. The court makes the following findings as they relate to this charge:
>
> That the offender's conduct is more serious than conduct normally constituting the offense.
>
> The court finds that the victim of the offense suffered the ultimate physical harm of death.
>
> The court finds the defendant is likely to commit future crimes and has a very high risk to re-offend.
>
> The defendant has a juvenile adjudication for committing an armed robbery in Florida at the age of 15.
>
> The defendant has shown no genuine remorse for the offense.

23

> The defendant has shown no acceptance of responsibility.
>
> The defendant's crime was cruel and unnecessary.
>
> The trial testimony in this case demonstrates the defendant's callous disregard for human life. After shooting and incapacitating [the victim], the defendant walked up to [him] and shot him again, guaranteeing his death. The family of [the victim] needlessly suffered the loss of their loved one.

{¶78} The Ohio Supreme Court has made it clear that "an appellate court is directed that it must have a firm belief or conviction that the record does not support the trial court's findings before it may increase, reduce, or otherwise modify consecutive sentences." *State v. Gwynne*, 2023-Ohio-3851, ¶ 15 (plurality). The trial court made the appropriate considerations, and we cannot say the record creates a firm belief or conviction that the trial court's findings are not so supported.

{¶79} Roberts' final assignment of error is without merit.

{¶80} The judgment of the trial court is affirmed.

MARY JANE TRAPP, J.,

MATT LYNCH, J.,

concur.

Case No. 2023-T-0097